1  David Fernandes (SBN 280944)
   BARON & BUDD, P.C.
2  3102 Oak Lawn Avenue, Suite 1100
   Dallas, TX 75219
3  Tel.: (214) 521-3605
   Fax: (214) 279-9915
4  Email: dfernandes@baronbudd.com

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**8/15/2025 11:02 AM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By J. Nunez, Deputy Clerk**

5  *Counsel for Plaintiffs*

6  ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

7  ### COUNTY OF LOS ANGELES

8  JOHN MATLOCK, VICTORIA BIGGS,
   ALLAN BLASBAND, EUGENE
9  BORGHELLO, MICHAEL BUSE, ROBERT
   CARILLO, ERIK DELGADO, BYNUM
10 HENLEY, CARL HISEY, JASON KAHELE,
   JIMMIE LASATER, JOHN MARTSOLF JR.,
11 CHARLES MASCARENAS SR. O/B/O THE
   HEIRS AND ESTATE OF ROBERT
12 MASCARENAS, RICHARD MOORE,
   HARVEY NOVICK, SARAH PARSINIA
13 O/B/O THE HEIRS AND ESTATE OF ALEX
   PARSINIA, SAMUEL SAMANO JR.,
14 RALPH SCOTT O/B/O THE HEIRS AND
   ESTATE OF RAY SCOTT, AUSTIN SMITH,
15 CHERRY STANLEY, CHARLES STEVENS,
   JEFFREY STRUKEL, JULIO TAPIA,
16 SUSAN THOMAS, JANINE SPRINGSTEAD
   O/B/O THE HEIRS AND ESTATE OF
17 KATHERINE TORRES, DALE EDWARD
   TURNER, MAURITA WAGAMAN,
18 EDWARD WARNER, CHARLES WEBER
   III O/B/O THE HEIRS AND ESTATE OF
19 DIANE WEBER, TIMOTHY WELCH,
   KEITH WILSON, AND IAN YIP,
20
21 Plaintiffs,
22
23 vs.
24
25 3M COMPANY (f/k/a Minnesota Mining and
   Manufacturing, Co.); AGC CHEMICALS
26 AMERICAS, INC.; AGC, INC. (f/k/a Asahi
   Glass Co., Ltd.);  ARCHROMA U.S., INC.;
27 ARKEMA, INC.; BASF CORPORATION;
   BUCKEYE FIRE EQUIPMENT CO.;
28 CHEMDESIGN PRODUCTS, INC.;
   CHEMGUARD, INC.; CLARIANT
   CORPORATION; CORTEVA, INC.;

CASE NO.  ___25STCV24228___

**COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL**

(1) Strict Liability Design Defect- Consumer
Expectation Test
(2) Strict Liability Design Defect- Risk
Benefit Test
(3) Strict Liability Failure to Warn
(4) Negligence- Duty to Warn
(5) Negligence- Failure to Recall
(6) Violation of the Uniform Voidable
Transfer Act
(7) Civil Conspiracy
(8) Wrongful Death
(9) Survival Claims

---

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - Page 1

**Exhibit A, Page 14**

1   DUPONT DE NEMOURS, INC.; DYNAX
    CORPORATION; E.I. DU PONT DE
2   NEMOURS AND COMPANY; THE
    CHEMOURS COMPANY; THE
3   CHEMOURS COMPANY FC, LLC; TYCO
    FIRE PRODUCTS, LP, AND JOHN DOE
4   DEFENDANTS 1-49,

5       Defendants.

6

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

7

8        COME NOW Plaintiffs, John Matlock, Victoria Biggs, Allan Blasband, Eugene Borghello,

9   Michael Buse, Robert Carillo, Erik Delgado, Bynum Henley, Carl Hisey, Jason Kahele, Jimmie

10  Lasater, John Martsolf Jr., Charles Mascarenas Sr. O/B/O The Heirs and Estate of Robert

11  Mascarenas, Richard Moore, Harvey Novick, Sarah Parsinia O/B/O The Heirs and Estate of Alex

12  Parsinia, Samuel Samano Jr., Ralph Scott O/B/O The Heirs and Estate of Ray Scott, Austin Smith,

13  Cherry Stanley, Charles Stevens, Jeffrey Strukel, Julio Tapia, Susan Thomas, Janine Springstead

14  O/B/O The Heirs and Estate of Katherine Torres, Dale Edward Turner, Maurita Wagaman, Edward

15  Warner, Charles Weber III O/B/O The Heirs and Estate of Diane Weber, Timothy Welch, Keith

16  Wilson, and Ian Yip by and through undersigned counsel, and bring this action against Defendants

17  3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), AGC Chemicals Americas, Inc.,

18  AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Archroma U.S., Inc., Arkema Inc., BASF Corporation,

19  Buckeye Fire Equipment Company, Chemdesign Products, Inc., Chemguard, Inc., Clariant

20  Corporation, Corteva, Inc., DuPont De Nemours, Inc., Dynax Corporation, E.I. Du Pont de

21  Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Tyco Fire

22  Products, LP (individually and as successor-in-interest to The Ansul Company), and John Doe

23  Defendants 1-49.  Plaintiffs hereby allege, upon information and belief, as follows:

24

25          **I.**      **SUMMARY OF THE CASE**

26     1.     Plaintiffs bring this action against Defendants who manufactured aqueous film-

27  forming foam ("AFFF"), exposure to which resulted in Plaintiffs' serious personal injuries.  The

28  AFFF manufactured by Defendants contained per- and polyfluoroalkyl substances ("PFAS")

**Exhibit A, Page 15**

1    including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic

2    acid ("PFOS").

3        2.    PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS,

4    PFOA, and/or their chemical precursors, are or were components of AFFF products, which are

5    firefighting suppressant agents used in training and firefighting activities for fighting Class B fires.

6    Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable

7    liquids.

8        3.    PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate

9    in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also

10    associated with multiple and significant adverse health effects in humans, including but not limited

11    to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and

12    pregnancy-induced hypertension.

13        4.    At various times from the 1960s through today, Defendants designed,

14    manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or

15    their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the

16    fluorosurfactants and/or perfluourinated chemicals contained in AFFF.

17        5.    This Complaint refers to AFFF, PFOA, PFOS, PFAS compounds, and

18    fluorosurfactants collectively as "Fluorosurfactant Products."

19        6.    Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the

20    knowledge that firefighters would be exposed to these toxic compounds during fire protection,

21    training, and response activities even when the AFFF was used as directed and intended by the

22    manufacturer.

23        7.    Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the

24    knowledge that PFAS are toxic, persist indefinitely, and would be routinely released into the

25    environment, including the drinking water supply, even when the AFFF was used as directed and

26    intended by Defendants.

27        8.    Due to the widespread PFAS contamination caused by Defendants'

28    Fluorosurfactant Products, including the contamination of Plaintiffs' drinking water supplies,

1  Plaintiffs have suffered serious personal injuries set forth in detail below. Plaintiffs' injuries are a
2  direct result of their exposure to the PFAS contamination present in their drinking water supplies.

3      9.     Plaintiffs, as residents and those who visited, worked, or resided in the
4  contaminated areas, have been unknowingly exposed for many years to dangerous PFAS levels.

5      10.    Plaintiffs' unwitting exposure to PFAS in their water supply as a result of
6  Defendants' conduct set forth below is the direct and proximate cause of Plaintiffs' injuries.

7      11.    Plaintiffs file this lawsuit to recover compensatory and all other damages, including
8  but not limited to past and future (1) expenses for care, treatment and hospitalization incident to
9  their injuries; (2) compensation for physical pain and suffering; (3) loss of income, wages, or
10 earning capacity; (4) compensation for mental or emotional pain and anguish; (5) physical
11 impairment; (6) loss of companionship and society; (7) inconvenience; (8) loss of enjoyment of
12 life; and (9) exemplary damages.

13                          **II.    PARTIES**

14     **A.  <u>Plaintiffs</u>**

15     12.    Plaintiff John Matlock is a citizen and resident of Los Angeles, California. From
16 approximately 1970 to 2025, Plaintiff John Matlock was regularly exposed to PFAS through
17 drinking water at residences and schools in Compton, California; Los Angeles, California;
18 Hawthorne, California; Wilmington, California; Torrance, California; and Inglewood, California.

19     13.     On or about September 2024, Plaintiff John Matlock was diagnosed with kidney
20 cancer at Harbor UCLA Medical Center in Torrance, California and subsequently underwent a
21 partial right nephrectomy.

22     14.    Plaintiff Victoria Biggs is a citizen and resident of Pahrump, Nevada. From
23 approximately 1963 to 2023, Plaintiff Victoria Biggs was regularly exposed to PFAS through
24 drinking water at residences and workplaces in Antioch, California; Concord, California;
25 Martinez, California; and Brentwood, California.

26     15.    On or about August 2006, Plaintiff Victoria Biggs was diagnosed with kidney
27 cancer at John Muir Concord Medical Center in Concord, California and subsequently underwent
28 a partial right nephrectomy. On or about June 2018, Plaintiff Victoria Biggs was again diagnosed

1  with kidney cancer at Sutter Delta Medical Center in Antioch, California and subsequently

2  underwent a partial left nephrectomy.

3      16.    Plaintiff Allan Blasband is a citizen and resident of Henderson, Nevada. From

4  approximately 1953 to 2022, Plaintiff Allan Blasband was regularly exposed to PFAS through

5  drinking water at residences in Voorhees Township, New Jersey; West Hollywood, California;

6  Los Angeles, California; Beverly Hills, California; Studio City, California; Valley Village,

7  California; and Sherman Oaks, California.

8      17.    On or about January 2019, Plaintiff Allan Blasband was diagnosed with kidney

9  cancer at Ronald Reagan UCLA Medical Center in Los Angeles, California and subsequently

10  underwent a partial left nephrectomy.

11      18.    Plaintiff Eugene Borghello is a citizen and resident of Vacaville, California. From

12  approximately 1970 to 2024, Plaintiff Eugene Borghello was regularly exposed to PFAS through

13  drinking water at residences and workplaces in Daly City, California; Vacaville, California; and

14  Fairfield, California.

15      19.    On or about 2015, Plaintiff Eugene Borghello was diagnosed with kidney cancer

16  at NorthBay Health VacaValley Hospital in Vacaville, California and subsequently underwent a

17  radical left nephrectomy.

18      20.    Plaintiff Michael Buse is a citizen and resident of Eleele, Hawaii. From

19  approximately 1978 to 2008, Plaintiff Michael Buse was regularly exposed to PFAS through

20  drinking water at residences and workplaces in Los Prietos Ranger Station, California; Schofield

21  Barracks, Hawaii; Hickam Air Force Base, Hawaii; Kaneohe, Hawaii; and Goleta, California.

22  Plaintiff Michael Buse was further exposed to PFAS through his use of AFFF while employed as

23  a firefighter in Santa Barbara, California from approximately 1974 to 1982.

24      21.    On or about 2015, Plaintiff Michael Buse was diagnosed with thyroid disease at

25  The Queen's Medical Center located in Honolulu, Hawaii and subsequently underwent related

26  treatment.

27      22.    Plaintiff Robert Carrillo is a citizen and resident of Chino, California. From

28  approximately 1984 to 2025, Plaintiff Robert Carrillo was regularly exposed to PFAS through

**Exhibit A, Page 18**

drinking water at residences in Los Angeles, California; Salina, Kansas; and Chino, California.

23.     On or about January 2022, Plaintiff Robert Carrillo was diagnosed with thyroid cancer at Kaiser Permanente Medical Center in Quintana, California, and subsequently underwent a thyroidectomy.

24.     Plaintiff Erik Delgado is a citizen and resident of Los Angeles, California. From approximately 1997 to 2025, Plaintiff Erik Delgado was regularly exposed to PFAS through drinking water at residences in Pasadena, California; Los Angeles, California; and Glendora, California.

25.     On or about January 2010, Plaintiff Erik Delgado was diagnosed with testicular cancer at Huntington Hospital in Pasadena, California and subsequently underwent a total right orchiectomy and chemotherapy treatment.

26.     Plaintiff Bynum Henley is a citizen and resident of Hesperia, California. From approximately 1983 to 2024, Plaintiff Bynum Henley was regularly exposed to PFAS through drinking water at residences in Montclair, California; Pasadena, California; Ontario, California; Montebello, California; Upland, California; and Hesperia, California. Plaintiff Bynum Henley was further exposed to PFAS through his use of AFFF while employed as a firefighter in San Luis Obispo, California and San Bernardino, California from approximately 1987 to 1989.

27.     On or about 2016, Plaintiff Bynum Henley was diagnosed with kidney cancer at Victor Valley Global Medical in Victorville, California and subsequently underwent a radical right nephrectomy.

28.     Plaintiff Carl Hisey is a citizen and resident of Riverside, California. From approximately 1994 to 2012, Plaintiff Carl Hisey was regularly exposed to PFAS through drinking water at residences in Riverside, California and Chino, California. Plaintiff Carl Hisey was further exposed to PFAS through his use of AFFF while employed as a firefighter in Isleton, California;

Klamath, California; and Susanville, California from approximately 2009 to 2013.

29.    On or about 2009, Plaintiff Carl Hisey was diagnosed with testicular cancer at Riverside University Health System Medical Center in Moreno Valley, California and subsequently underwent a total left orchiectomy.

30.    Plaintiff Jason Kahele is a citizen and resident of Tracy, California. From approximately 1998 to 2024, Plaintiff Jason Kahele was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Rucker, Alabama; Alameda Naval Air Station, California; San Leandro, California; Hayward, California; Pittsburg, California; Tracy, California; San Ramon, California; and Oakland, California.

31.    On or about July 2025, Plaintiff Jason Kahele was diagnosed with testicular cancer at Kaiser Permanente Manteca Medical Offices in Manteca, California and subsequently underwent a total right orchiectomy.

32.    Plaintiff Jimmie Lasater is a citizen and resident of Siloam Springs, Arkansas. From approximately 1983 to 2025, Plaintiff Jimmie Lasater was regularly exposed to PFAS through drinking water at residences in Modesto, California and Siloam Springs, Arkansas.

33.    On or about 2015, Plaintiff Jimmie Lasater was diagnosed with kidney cancer at Siloam Springs Regional Hospital in Siloam Springs, Arkansas and subsequently underwent a partial right nephrectomy.

34.    Plaintiff John Martsolf is a citizen and resident of Murphys, California. From approximately 1997 to 2001, Plaintiff John Martsolf was regularly exposed to PFAS through drinking water at residences and workplaces in San Jose, California and Milpitas, California. Plaintiff John Martsolf was further exposed to PFAS through his use of AFFF while employed as a terminal operator in Los Angeles, California from approximately 1978 to 1997.

35.    On or about February 14, 2020, Plaintiff John Martsolf was diagnosed with

**Exhibit A, Page 20**

testicular cancer at El Camino Health Urology-Bascom in San Jose, California and subsequently underwent a total right orchiectomy. On or about 2020, Plaintiff John Martsolf was further diagnosed with thyroid disease at Endocrine Medical Associates located in Campbell, California.

36.     Plaintiff Charles Mascarenas Sr., on behalf of the heirs and Estate of Robert Mascarenas, deceased, is a citizen and resident of Yuma, Arizona. Plaintiff Charles Mascarenas Sr. is a surviving sibling and heir of Decedent Robert Mascarenas and the anticipated personal representative of his estate. From approximately 1981 to 2023, Decedent Robert Mascarenas was regularly exposed to PFAS through drinking water at residences in Perris, California and Menifee, California.

37.     On or about November 23, 2023, Decedent Robert Mascarenas was diagnosed with kidney cancer at Onvida Health Urology in Yuma, Arizona and subsequently underwent immunotherapy treatment. On or about November 10, 2024, Decedent Robert Mascarenas passed away from cardiac arrest due to or as a consequence of malignant neoplasm of the kidney.

38.     Plaintiff Richard Moore is a citizen and resident of Seligman, Arizona. From approximately 1988 to 2022, Plaintiff Richard Moore was regularly exposed to PFAS through drinking water at residences, schools, and workplaces in Chula Vista, California; Lakeside, California; and El Cajon, California.

39.     On or about 2014, Plaintiff Richard Moore was diagnosed with testicular cancer at Sharp Memorial Hospital Laurel Amtower Cancer Institute and Neuro-Oncology Center in San Diego, California and subsequently underwent a total left orchiectomy, lymph node dissection, and chemotherapy treatment. On or about 2017, Plaintiff Richard Moore was again diagnosed with testicular cancer at UC San Diego Health in San Diego, California and subsequently underwent a tumor removal and chemotherapy treatment.

40.     Plaintiff Harvey Novick is a citizen and resident of Saint Paul, Minnesota. From approximately 1958 to 2025, Plaintiff Harvey Novick was regularly exposed to PFAS through drinking water at residences and workplaces in Naval Weapons Station Seal Beach, California and Saint Paul, Minnesota.

41.     On or about December 9, 2010, Plaintiff Harvey Novick was diagnosed with clear cell renal carcinoma at M Health Fairview University of Minnesota Medical Center- East Bank in Minneapolis, Minnesota and subsequently underwent a radical left nephrectomy and immunotherapy.

42.     Plaintiff Sarah Parsinia, on behalf of the heirs and Estate of Alex Parsinia, deceased, is a citizen and resident of Chatsworth, California. Plaintiff Sarah Parsinia is the surviving daughter and heir of Decedent Alex Parsinia and the anticipated personal representative of his estate. From approximately 1979 to 2024, Decedent Alex Parsinia was regularly exposed to PFAS through drinking water at residences and workplaces in Bakersfield, California; Malibu, California; Woodland Hills, California; Beverly Hills, California; Los Angeles, California; Calabasas, California; Van Nuys; California; Encino, California; and Commerce, California.

43.     On or about 2020, Decedent Alex Parsinia was diagnosed with testicular cancer at Cedars-Sinai Medical Center in Los Angeles, California and subsequently underwent a total orchiectomy and radiation treatment. On or about 2020, Decedent Alex Parsinia was further diagnosed with kidney cancer at Cedars-Sinai Medical Center in Los Angeles, California and subsequently underwent a partial nephrectomy. On or about 2024, Decedent Alex Parsinia was diagnosed with ulcerative colitis at Henry Mayo Newhall Hospital located in Santa Clarita, California. On or about November 20, 2024, Decedent Alex Parsinia passed away in Santa Clarita, California.

44.     Plaintiff Samuel Samano Jr. is a citizen and resident of Los Angeles, California. From approximately 1976 to 2025, Plaintiff Samuel Samano Jr. was regularly exposed to PFAS through drinking water at residences in Los Angeles, California.

45.     On or about 2005, Plaintiff Samuel Samano Jr. was diagnosed with testicular cancer at Los Angeles General Medical Center in Los Angeles, California and subsequently underwent a total right orchiectomy and chemotherapy treatment.

46.     Plaintiff Ralph Scott, on behalf of the heirs and Estate of Ray Scott, deceased, is a citizen and resident of Santa Clarita, California. Plaintiff Ralph Scott is the surviving sibling and heir of Decedent Ray Scott and the anticipated personal representative of his estate. From

1  approximately 1968 to 2023, Decedent Ray Scott was regularly exposed to PFAS through drinking

2  water at residences and workplaces in Fort Benning, South Carolina; Fort Bragg, North Carolina;

3  Los Angeles, California; and Santa Clarita, California.

4       47.  On or about 2020, Decedent Ray Scott was diagnosed with clear cell renal

5  carcinoma at North Las Vegas VA Medical Center in North Las Vegas, Nevada and subsequently

6  underwent a radical right nephrectomy. On or about 2022, Decedent Ray Scott was again

7  diagnosed with clear cell renal carcinoma at West Los Angeles VA Medical Center in Los Angeles,

8  California and subsequently underwent chemotherapy treatment. On or about July 23, 2023,

9  Decedent Ray Scott passed away in Los Angeles, California as a result of his metastatic renal cell

10  carcinoma.

11       48.  Plaintiff Austin Smith is a citizen and resident of Sturgeon Bay, Wisconsin. From

12  approximately 1990 to 2025, Plaintiff Austin Smith was regularly exposed to PFAS through

13  drinking water at residences, schools, and workplaces in Granda Hills, California; Los Angeles,

14  California; and Sturgeon Bay, Wisconsin.

15       49.  On or about 2008, Plaintiff Austin Smith was diagnosed with testicular cancer at

16  Kaiser Permanente Woodland Hills Medical Center in Los Angeles, California and subsequently

17  underwent a total left orchiectomy.

18       50.  Plaintiff Cherry Stanley is a citizen and resident of Venice, California. From

19  approximately 1984 to 2025, Plaintiff Cherry Stanley was regularly exposed to PFAS through

20  drinking water at residences in Venice, California; Los Angeles, California; Marina Del Rey,

21  California; and New York, New York.

22       51.  On or about June 4, 2011, Plaintiff Cherry Stanley was diagnosed with clear cell

23  renal carcinoma by Mercedes Martinez, MD in New York, New York and subsequently underwent

24  a partial right nephrectomy.

25       52.  Plaintiff Charles Stevens is a citizen and resident of San Jose, California. From

26  approximately 1984 to 2017, Plaintiff Charles Stevens was regularly exposed to PFAS through

27  drinking water at residences and workplaces in Moffett Field, California; Santa Clara, California;

28  San Jose, California; Carmichael, California; Sacramento, California; and Citrus Heights,

1  California.

2      53.    On or about November 17, 2023, Plaintiff Charles Stevens was diagnosed with

3  clear cell renal carcinoma at Kaiser Permanente Santa Clara Medical Center in Santa Clara,

4  California and subsequently underwent a cryoablation and chemotherapy treatment.

5      54.    Plaintiff Jeffrey Strukel is a citizen and resident of El Cajon, California. From

6  approximately 1982 to 2025, Plaintiff Jeffrey Strukel was regularly exposed to PFAS through

7  drinking water at residences in Santee, California; La Mesa, California; Jamul, California; and El

8  Cajon, California.

9      55.    On or about 2005, Plaintiff Jeffrey Strukel was diagnosed with testicular cancer at

10  Sharp Grossmont Hospital in La Mesa, California and subsequently underwent a total bilateral

11  orchiectomy.

12     56.    Plaintiff Julio Tapia is a citizen and resident of Compton, California. From

13  approximately 1984 to 2025, Plaintiff Julio Tapia was regularly exposed to PFAS through drinking

14  water at residences and schools in Compton, California.

15     57.    On or about 2022, Plaintiff Julio Tapia was diagnosed with kidney cancer at Kaiser

16  Permanente Carson Medical Offices in Gardena, California and subsequently underwent a

17  cryoablation.

18     58.    Plaintiff Susan Thomas is a citizen and resident of Prescott, Arizona. From

19  approximately 1972 to 2013, Plaintiff Susan Thomas was regularly exposed to PFAS through

20  drinking water at residences and workplaces in Valencia, California; Castaic, California;

21  Stevenson Ranch, California; Santa Clarita, California; Temecula, California; and Menisee,

22  California.

23     59.    On or about January 2012, Plaintiff Susan Thomas was diagnosed with kidney

24  cancer at Tri Valley Urology Medical Group in Murrieta, California and subsequently underwent

25  a partial left nephrectomy.

26     60.    Plaintiff Janine Springstead on behalf of the heirs and Estate of Katherine Torres

27  deceased, is a citizen and resident of Riverside, California. Plaintiff Janine Springstead is the

28  surviving daughter and heir of Decedent Katherine Torres and the anticipated personal

1   representative of her estate. From approximately 1983 to 2025, Decedent Katherine Torres was

2   regularly exposed to PFAS through drinking water at residences in Perris, California.

3       61.    On or about 2024, Decedent Katherine Torres was diagnosed with thyroid disease

4   at Riverside University Health System Medical Center located in Moreno Valley, California. On

5   or about January 11, 2025, Decedent Katherine Torres was diagnosed with kidney cancer at

6   Riverside University Health System Medical Center. On or about March 24, 2025, Decedent

7   Katherine Torres passed away in Perris, California as a result of her kidney cancer.

8       62.    Plaintiff Dale Edward Turner is a citizen and resident of West Hollywood,

9   California. From approximately 1970 to 2025, Plaintiff Dale Edward Turner was regularly

10  exposed to PFAS through drinking water at residences in San Deigo, California; Spring Valley,

11  California; Los Angeles, California; and West Hollywood, California.

12      63.    On or about June 2013, Plaintiff Dale Edward Turner was diagnosed with testicular

13  cancer at Tower Urology in Los Angeles, California and subsequently underwent a total left

14  orchiectomy.

15      64.    Plaintiff Maurita Wagaman is a citizen and resident of Tucson, Arizona. From

16  approximately 1990 to 2025, Plaintiff Maurita Wagaman was regularly exposed to PFAS through

17  drinking water at residences in Chula Vista, California; Lemon Grove, California; Imperial Beach,

18  California; Whittier, California; San Diego, California; El Cajon, California; Lakeside, California;

19  and Tucson, Arizona.

20      65.    On or about 2012, Plaintiff Maurita Wagaman was diagnosed with ulcerative colitis

21  at Kaiser Permanente San Diego Medical Center located in San Diego, California. On or about

22  2013, Plaintiff Maurita Wagaman was diagnosed with kidney cancer at Kaiser Permanente San

23  Diego Medical Center in San Diego, California and subsequently underwent a partial right

24  nephrectomy.

25      66.    Plaintiff Edward Warner is a citizen and resident of Yuba City, California. From

26  approximately 1978 to 2024, Plaintiff Edward Warner was regularly exposed to PFAS through

27  drinking water at residences and workplaces in George Air Force Base, California; Nellis Air

28  Force Base, Nevada; Hesperia, California; and Yuba City, California.

67.    On or about 2006, Plaintiff Edward Warner was diagnosed with testicular cancer at Adventist Health Sonora in Sonora, California and subsequently underwent a total left orchiectomy, tumor removal, retroperitoneal lymph node dissection, and chemotherapy treatment at Stanford Medicine Cancer Center in Palo Alto, California.

68.    Plaintiff Charles Weber III, on behalf of the heirs and Estate of Diane Weber, deceased, is a citizen and resident of North Hills, California. Plaintiff Charles Weber III is the surviving spouse and heir of Decedent Diane Weber and the personal representative of her estate. From approximately 1980 to 2024, Decedent Diane Weber was regularly exposed to PFAS through drinking water at residences and workplaces in Los Angeles, California; Northridge, California; Palmdale, California; Sepulveda, California; and North Hill, California.

69.    On or about September 15, 2024, Decedent Diane Weber was diagnosed with clear cell renal carcinoma at Henry Mayo Newhall Hospital Heliport in Valencia, California and subsequently underwent a partial right nephrectomy. On or about September 29, 2024, Decedent Diane Weber passed away in Los Angeles, California as a result of her clear cell renal carcinoma.

70.    Plaintiff Timothy Welch is a citizen and resident of Fresno, California. From approximately 1971 to 2025, Plaintiff Timothy Welch was regularly exposed to PFAS through drinking water at residences in Fresno, California.

71.    On or about April 2013, Plaintiff Timothy Welch was diagnosed with testicular cancer at Kaiser Permanente Fresno Medical Center in Fresno, California and subsequently underwent a total bilateral orchiectomy, retroperitoneal lymph node dissection, and chemotherapy treatment.

72.    Plaintiff Keith Wilson is a citizen and resident of Seattle, Washington. From approximately 1990 to 1993, Plaintiff Keith Wilson was regularly exposed to PFAS through drinking water at his residence in Santa Cruz, California.

73.    On or about 2005, Plaintiff Keith Wilson was diagnosed with testicular cancer at UW Medical Center - Montlake Seattle Hospital in Seattle, Washington and subsequently underwent a total left orchiectomy and chemotherapy treatment.

74.    Plaintiff Ian Yip is a citizen and resident of Calabasas, California. From

approximately 1990 to 2025, Plaintiff Ian Yip was regularly exposed to PFAS through drinking water at residences in St. Louis, Missouri; Los Angeles, California; and Calabasas, California.

75.    On or about May 2024, Plaintiff Ian Yip was diagnosed with kidney cancer and subsequently underwent a partial right nephrectomy and other related treatment.

**B.  Defendants**

72.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products to which Plaintiffs were exposed.

73.    **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

74.    3M is the only company that manufactured and/or sold AFFF containing PFOS.

75.    **AGC AMERICA:** Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

76.    **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

77.    **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

78.    **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under

1  the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King

2  of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

3      79.    **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its

4  principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon

5  information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty

6  Chemicals.

7      80.    **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a

8  foreign corporation organized and existing under the laws of the State of Ohio, with its principal

9  place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant

10  manufactured and sold AFFF that contained PFOA.

11      81.    **CHEMDESIGN:** Defendant ChemDesign Products, Inc. ("ChemDesign") is a

12  Texas corporation with its principal place of business located at 2 Stanton Street, Marinette,

13  Wisconsin 54143.

14      82.    **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation

15  organized and existing under the laws of the State of Wisconsin, with its principal place of

16  business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant

17  manufactured and sold AFFF that contained PFOA.

18      83.    **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York

19  corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North

20  Carolina 28205.

21      84.    **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with

22  its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

23      85.    **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a

24  DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974

25  Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017

26  as a result of the merger of Dow Chemical and DuPont.

27      86.    Upon information and belief, Corteva was originally formed in February 2018 as a

28  wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its

1  agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed

2  all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by

3  way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva

4  became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

5       87.    Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc.,

6  DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon

7  information and belief, New DuPont retained assets in the specialty products business lines, as

8  well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

9       88.    **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with

10  its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

11  Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in

12  AFFF.

13       89.    **DUPONT:** Defendant E.I. Du Pont De Nemours and Company ("DuPont") is a

14  corporation organized and existing under the laws of the State of Delaware with its principal place

15  of business located at 974 Centre Road, Wilmington, Delaware 19805.

16       90.    **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation

17  organized and existing under the laws of the State of Delaware, with its principal place of business

18  located at 1007 Market Street, Wilmington, Delaware 19899.

19       91.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours,

20  along with certain environmental liabilities. Upon information and belief, at the time of the

21  transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened

22  with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's

23  liability for damages and injuries arising from the manufacture and sale of PFAS compounds and

24  products that contain PFAS compounds.

25       92.    **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours

26  FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited

27  liability company that conducts business throughout the United States. Its principal place of

28  business is 1007 Market Street Wilmington, Delaware, 19899.

93.   **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

94.   Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

95.   Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

96.   Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

97.   All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the State of California.

98.   Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

99.   The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    JURISDICTION & VENUE

100.    This Court has jurisdiction pursuant to Cal. Const. art. VI, § 10.

101.    This Court may exercise personal jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market either through the distribution or sale of products containing PFAS in the State of California or by having a manufacturing, distribution or other facility located in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

102.    Venue is appropriate in this county pursuant to Cal. Code Civ. Proc. §395 as facts giving rise to the Plaintiffs' injuries occurred in this County.

### IV.    FACTUAL ALLEGATIONS

**A.  The PFAS Contaminants at Issue: PFOA and PFOS**

103.    Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

104.    PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

105.    PFOA and PFOS are stable, man-made chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

106.    Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water,

1    soil and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood

2    serum.[1]

3       107.    Moreover, PFOA and PFOS are persistent in the human body and resistant to

4    metabolic degradation. A short-term exposure can result in a body burden that persists for years

5    and can increase with additional exposures.[2]

6       108.    Notably, from the time these two compounds were first produced, information has

7    emerged showing negative health effects caused by exposure to PFOA and PFOS. According to

8    EPA, PFOA and PFOS are associated with high cholesterol, thyroid disorders, pregnancy-induced

9    hypertension, preeclampsia, reproductive, developmental, and systemic effects, and cancers.[3]

10      109.    The EPA has warned that there is suggestive evidence of the carcinogenic potential

11   for PFOA and PFOS in humans.[4]

12      110.    EPA continues to research the effects of PFAS. In June 2022, after evaluating over

13   400 studies published since 2016 and applying human health risk assessment approaches, tools,

14   and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS

15   exposure at which negative outcomes could occur are much lower than previously understood

16   when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt). EPA

17   therefore announced new Interim Updated Health Advisory levels for PFOA of 0.004 ppt and 0.02

18   ppt for PFOS.[5]

19   _____

20   [1] EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS),* Document No. EPA 822-R-16-002 (May 2016), available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025); EPA, *Health Effects Support Document for Perfluorooctanoic Acid (PFOA),* available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed March 11, 2025).

21
22
23   [2] *See* notes 1, 2, *supra. See also* EPA, Technical *Fact Sheet – Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA),* available at https://www.regulations.gov/document/EPA-HQ-TRI-2022-0270-0009 (last accessed March 11, 2025).

24
25   [3] *Id.*

26   [4] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025).

27   [5] EPA, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)*, Document Number 822-F-22-002, available at

28   https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P10154ST.txt (last accessed March 11, 2025).

111.     In April, 2024, EPA established legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA as contaminants with individual MCLs, and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL to account for the combined and co-occurring levels of these PFAS in drinking water. EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for these PFAS.   The MCLs for PFOA and PFOS are each 4 parts per trillion ("ppt").[6]

**B.  Aqueous Film-Forming Foam (AFFF) Contained PFOS and/or PFOA at Relevant Times**

112.     Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

113.     Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

114.     The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

115.     When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters).  When using AFFF, firefighters may absorb PFOA and PFOS through their skin, inhale PFOA and PFOS compounds, or inadvertently ingest PFOA and PFOS compounds. Additionally, when used as the Defendants intended and directed, AFFF causes PFOA and PFOS to seep into groundwater, and thus, drinking water supplies in the areas in which it is

---

[6] EPA, Per- and *Polyfluoroalkyl Substances (PFAS), Final PFAS National Primary Drinking Water Regulation*, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed March 11 2025).

**Exhibit A, Page 33**

1    used. Once in the water supply, PFOA and PFOS can travel long distances from where the AFFF

2    was used. This has resulted in widespread contamination of drinking water supplies with PFOA

3    and PFOS nationwide.

4        116.    Notably, AFFF can be made without PFOA and PFOS.  Unlike AFFF made with

5    PFOA or PFOS, fluorine-free foams do not pose a significant health risk to individuals.

6        117.    Despite having knowledge of this fact—as well as having knowledge regarding the

7    toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture,

8    distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to Plaintiffs'

9    injuries.

10       **C.  Defendants' Knowledge of PFOA and PFOS Hazards**

11       118.    On information and belief, by the 1970s, Defendants knew, or reasonably should

12   have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when AFFF is used

13   per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface,

14   mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-

15   potable, and can be removed from public drinking water supplies only at substantial expense.

16       119.    At all times pertinent herein, Defendants also knew or should have known that

17   PFOA and PFOS present a risk to human health and could be absorbed into the lungs and

18   gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous

19   system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that

20   cause genetic damage.

21       120.    For instance, in 1980, 3M published data in peer reviewed literature showing that

22   humans retain PFOA in their bodies for years. Based on that data, 3M estimated that it could take

23   a person up to 1.5 years to clear just half of the accumulated PFOA from their body after all

24   exposures had ceased.[7]

25       121.    By the early 1980s, the industry suspected a correlation between PFOA exposure

26

27   _____

28   [7] *See* Ubel, F.A., Sorenson, S.D., and Roach, D.E., *Health status of plant workers exposed to fluorochemicals - a preliminary report.*  Journal Am. Ind Hyg. Assoc. J 41:584-89 (1980).

1    and human health effects. Specifically, manufacturers observed bioaccumulation of PFOA in

2    workers' bodies and birth defects in children of workers.

3        122.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers

4    in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed

5    workers, finding two of seven children born to female plant workers between 1979 and 1981 had

6    birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.8

7        123.     Beginning in 1983, 3M documented a trend of increasing levels of PFOA in the

8    bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this

9    present trend with serious concern. It is certainly possible that [...] exposure opportunities are

10   providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."9

11       124.     Based on information and belief, in 2000, under pressure from the EPA, 3M

12   announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF

13   production did not fully phase out until 2002.   The company stopped producing PFOA at

14   approximately the same time.

15       125.     From 1951, DuPont, and on information and belief, Chemours, designed,

16   manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware,

17   and more recently PFAS feedstocks such as Forafac 1157 N, for use in the manufacturing of AFFF

18   products.

19       126.     On information and belief, by no later than 2001 Old DuPont manufactured,

20   produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of

21   the AFFF product manufacturers for use in their AFFF products that were discharged into the

22   environment and harmed Plaintiffs.

23

24   _____

25   8 *See* DuPont, *C-8 Blood Sampling Results,* available at
     https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21G

26   C49KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0MC4wLjAuMA..&_ga=2.26293428.885409355.16835878
     69-581783177.1682689989 (last accessed March 11, 2025).

27   9 *See* 3M, Internal Memorandum, *Organic Fluorine Levels*, (August 31, 1984), Office of Minnesota Attorney
     General, Exhibit List, No. 1313, available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp (last

28   accessed March 11, 2025).

127. DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.10

128. By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."11

129. By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"12 between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.13 By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

130. In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped

---

10 EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed March 11, 2025).

11 *Id.*

12 Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease. *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed March 11, 2025).

13 *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last accessed March 11, 2025).

**Exhibit A, Page 36**

1    its perfluorinated chemical liabilities into the lap of the new Chemours.

2    131.    Defendants also knew or should have known that: (a) users of AFFF would likely

3    include fire and rescue training organizations and their personnel; (b) fire and rescue personnel

4    were foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training

5    and real-life fire emergency scenarios; (c) PFOA and PFOS are dangerous to human health when

6    used by fire and rescue personnel; (d) fire and rescue personnel foreseeably lacked knowledge of

7    these dangers; and, (e) fire and rescue personnel would require warnings of these dangers and/or

8    affirmative instructions in the use of AFFF.

9    132.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1)

10   designed, manufactured, marketed, purchased, supplied, and/or sold PFOA/PFOS; (2) issued

11   instructions on how AFFF should be used and disposed of; (3) failed to recall and/or warn the

12   users of AFFF of the dangers to human health that result from the standard use and disposal of

13   these products; negligently designed products containing or degrading into PFOA and/or PFOS;

14   and (5) further failed and refused to issue the appropriate warnings and/or recalls to the users of

15   AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity

16   of the purchasers of the PFOA/PFOS.

17   133.    Further, Defendants failed to disclose to environmental regulators and the general

18   public the likely existence of and health risks to the public caused by widespread PFOA and PFOS

19   contamination in drinking water supplies across the country as a result of AFFF usage.

20   134.    As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs suffered

21   severe health effects caused by exposure to AFFF containing PFOA and/or PFOS.  As a direct and

22   proximate result, Plaintiffs incurred substantial harm, both economic and non-economic.

23   135.    Defendants had a duty and breached their duty to evaluate and test such products

24   adequately and thoroughly to determine their potential human health impacts before they sold such

25   products. They also had a duty and breached their duty to minimize the risk of harm to human

26   health caused by PFOA and PFOS.

27   **D.  The Impact of PFOA and PFOS on the Plaintiffs**

28   136.    Plaintiffs have been significantly and continuously exposed to PFOA and PFOS

1 over many years as a result of Defendants' conduct.

2     137.    Plaintiffs have been diagnosed with the serious injuries set forth above, including

3 kidney cancer, testicular cancer, thyroid disease, and ulcerative colitis.

4     138.    Plaintiffs' injuries were caused by Defendants' Fluorosurfactant Products.

5     139.    The use of Fluorosurfactant Products as directed and intended by the manufacturers

6 caused Plaintiffs' exposure to PFOA and PFOS, which caused Plaintiffs' injuries.

7     140.    Therefore, as a direct and proximate result of Defendants' tortious conduct as set

8 forth in this complaint, Plaintiffs were damaged in the following ways:

9     a.   Plaintiffs suffered physical pain and mental anguish;

10     b.   Plaintiffs incurred hospital, medical, pharmaceutical and other expenses; and

11     c.    Plaintiffs experienced undue stress related to their diagnoses, medical conditions,

12 and uncertainty about their prognosis.

13         **FIRST CAUSE OF ACTION**

14     **STRICT LIABILITY – DESIGN DEFECT – CONSUMER EXPECTATION TEST**

15     141.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

16     142.    Plaintiffs were harmed by Fluorosurfactant Products which were designed,

17 manufactured, marketed, sold and/or distributed by Defendants, and which were defectively

18 designed, did not include sufficient instructions, and did not include sufficient warning of potential

19 safety hazards of human exposure.

20     143.    Defendants' Fluorosurfactant Products did not perform as safely as an ordinary

21 consumer would have expected them to perform when used or misused in an intended or

22 reasonably foreseeable way.

23     144.    Defendants represented, asserted, claimed and/or warranted that their

24 Fluorosurfactant Products could be used in conformity with accompanying instructions and labels

25 in a manner that would not cause injury or damage.

26     145.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers,

27 and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom

28 Defendants' products might foreseeably harm, including Plaintiffs, not to manufacture, sell, or

1    market any product which is unreasonably dangerous for its intended and foreseeable uses.

2    146.      Defendants' Fluorosurfactant Products were used by or near Plaintiffs in a

3 reasonably foreseeable manner and without substantial change in the condition in which the

4 products were sold.

5    147.      Defendants knew, or should have known, that use of Defendants' Fluorosurfactant

6 Products in their intended manner would result in exposure of humans to PFOA and/or PFOS and

7 to resulting injury.

8    148.      Furthermore, Defendants knew, or should have known, that their Fluorosurfactant

9 Products were toxic and associated with medical conditions in humans.

10   149.      Plaintiffs were, are and will continue to be harmed by Defendants' defectively

11 designed Fluorosurfactant Products.

12   150.      Defendants' Fluorosurfactant Products' failure to perform safely was a substantial

13 factor in causing Plaintiffs' harm.

14   151.      As a direct and proximate result of Defendants' unreasonably dangerous design,

15 manufacture, and sale of PFAS-containing products and/or AFFF, Plaintiffs suffered personal

16 injuries as discussed throughout this Complaint.

17   152.      Defendants knew that it was substantially certain that their acts and omissions

18 described above would threaten the health of users like Plaintiffs.  Defendants committed each of

19 the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or

20 malice, and with conscious and/or reckless disregard for the health and safety of others, and for

21 the Plaintiffs' health.

22   <u>**SECOND CAUSE OF ACTION**</u>

23   **STRICT LIABILITY – DESIGN DEFECT – RISK BENEFIT TEST**

24   153.      Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

25   154.      Plaintiffs were harmed by Fluorosurfactant Products designed, manufactured,

26 marketed, sold and/or distributed by Defendants.

27   155.      Plaintiffs were, are, and will continue to be harmed by Defendants' defectively

28 designed Fluorosurfactant Products.

156.    The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiffs.

157.    The gravity of the harm to Plaintiffs resulting from Defendants' Fluorosurfactant Products outweighs the benefits of the Products' design.

158.    The likelihood that PFAS-containing products and/or AFFF would cause injuries to Plaintiffs far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

159.    At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

160.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to individuals, and thus Defendants were grossly negligent.

161.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PFAS-containing products and/or AFFF, Plaintiffs suffered personal injuries as discussed throughout this Complaint.

162.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten the health of users and the public, including Plaintiffs. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for the Plaintiffs' health.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

163.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

164.    PFAS-containing products and/or AFFF are unreasonably dangerous for their reasonably anticipated uses such that a risk of harm is inherent for the following reasons:

a.    Users of AFFF are exposed to PFOA and PFOS when AFFF is used, handled, or disposed of in its foreseeable and intended manner;

b.  PFOA and PFOS are likely to infiltrate the water supply when AFFF is used, handled, or disposed of in its foreseeable and intended manner;

c.  PFOA and PFOS exposure may cause diseases and cancers like Plaintiffs;

d.  PFOA and/or PFOS persist and bioaccumulate in the human body; and

e.  PFOA and/or PFOS pose significant threats to human and environmental health.

165.    As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to consumers, users, and foreseeable bystanders, including Plaintiffs, of the risks posed by exposure to PFAS (including PFOA and PFOS).

166.    Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health.

167.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiffs, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

168.    At all relevant times, including the time AFFF products were marketed, Defendants knew of or should have reasonably foreseen the human health risks associated with PFAS-containing products and/or AFFF, and Defendants failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PFAS-containing products and/or or an instruction that would have prevented the harm to Plaintiffs.

169.    Plaintiffs were exposed to PFAS-containing AFFF either directly or through their drinking water supply.

170.    At the time and place of Plaintiffs' exposure, Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

171.    Although Defendants were aware of the dangers posed by AFFF and Fluorosurfactant Products, the dangers were unknown and not foreseeable to Plaintiffs.

172.    As a direct and proximate result of Defendants' failure to warn, Plaintiffs suffered personal injuries and costs and damages resulting therefrom.

173.    The Defendants' failure to warn constitutes a causative nexus in Plaintiffs' injuries.

174.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten the health of users like Plaintiff.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others and for the Plaintiffs' health.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE – MANUFACTURER OR SUPPLIER – DUTY TO WARN

175.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

176.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Plaintiffs, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

177.    Despite the fact that Defendants knew that PFOA and PFOS are toxic and present significant risks to human health, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting Plaintiffs' exposure to PFOA and/or PFOS; (c) failed to warn the users of Fluorosurfactant Products of the dangers of exposure inherent in the use of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

178.     A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

179.     Plaintiffs were, are, and will continue to be harmed.

180.     Defendants' failure to warn or instruct was a substantial factor in causing Plaintiffs' harm.

181.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

182.     As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiffs have incurred, continue to incur, and/or will incur costs and damages related to the PFAS contamination of their Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

183.     Although Defendants were aware of the dangers posed by AFFF and Fluorosurfactant Products, the dangers were unknown and not foreseeable to Plaintiffs.

184.     As a direct and proximate result of Defendants' failure to warn, Plaintiffs suffered personal injuries and costs and damages resulting therefrom.

185.     The Defendants' failure to warn constitutes a causative nexus in Plaintiffs' injuries.

186.     Defendants knew that it was substantially certain that its acts and omissions described above would threaten the health of users and bystanders, including Plaintiffs. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others and for the Plaintiffs' health.

**FIFTH CAUSE OF ACTION**

**NEGLIGENCE – FAILURE TO RECALL**

187.     Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

188.     Defendants' Fluorosurfactant Products were designed, manufactured, marketed,

1   distributed and sold without adequate warning of toxicity and potential human health risks.

2   189.    Defendants were negligent by not using reasonable care to warn or instruct about

3   the risks associated with their Fluorosurfactant Products.

4   190.    Defendants knew or reasonably should have known that their Fluorosurfactant

5   Products were dangerous or likely to be dangerous when used or misused in a reasonably

6   foreseeable manner.

7   191.    Defendants knew or reasonably should have known that users and third parties

8   would not realize the dangers.

9   192.    Defendants became aware of the human health risks presented by their

10  Fluorosurfactant Products by no later than the year 2000.

11  193.    Defendants failed to recall their Fluorosurfactant Products.

12  194.    A reasonable manufacturer, seller, or distributor, under the same or similar

13  circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant

14  Products.

15  195.    Plaintiffs were, are, and will continue to be harmed.

16  196.    Defendants' failure to recall their Fluorosurfactant Products was a substantial factor

17  in causing Plaintiffs' harm.

18  197.    Defendants' conduct lacked any care and was an extreme departure from what a

19  reasonably careful company would do in the same situation to prevent harm to others and the

20  environment, and thus Defendants were grossly negligent.

21  198.    Although Defendants were aware of the dangers posed by AFFF products, the

22  dangers were unknown and not foreseeable to Plaintiffs.

23  199.    As a direct and proximate result of Defendants' failure to recall, Plaintiffs suffered

24  personal injuries and costs and damages resulting therefrom.

25  200.    The Defendants' failure to recall constitutes a causative nexus in Plaintiffs' injuries.

26  201.    Defendants knew that it was substantially certain that their acts and omissions

27  described above would threaten the health of users and the general public, including Plaintiffs.

28  Defendants committed each of the above-described acts and omissions knowingly, willfully,

1  and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the

2  health and safety of others and for the Plaintiffs' health.

3                          **SIXTH CAUSE OF ACTION**

4              **VIOLATION OF THE UNIFORM VOIDABLE TRANSFER ACT**

5      202.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

6      203.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent

7  Transfer Act ("UVTA") as adopted by the State of California in Cal. Civ. Code Ann. § 3439,

8  against E. I. Dupont de Nemours and Company, The Chemours Company, The Chemours

9  Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UVTA

10  Defendants").

11      204.    Pursuant to Cal. Civ. Code Ann. § 3439, "[a] transfer made or an obligation

12  incurred by a debtor is voidable as to a creditor, whether the claim of the creditor arose before, or

13  within a reasonable time not to exceed four years after, the transfer was made or the obligation

14  was incurred, if the debtor made the transfer or incurred the obligation as follows:

15      a.  With actual intent to hinder, delay, or defraud any creditor of the debtor;

16      b.  Without receiving a reasonably equivalent value in exchange for the transfer or obligation

17  of the debtor either:

18      A.  Was engaged or was about to engage in a business or a transaction for which the remaining

19  assets of the debtor were unreasonably small in relation to the business or transaction.

20      B.  Intended to incur, or believed or reasonably should have believed that the debtor would

21  incur, debts beyond the debtor's ability to pay as they became due."

22      205.    Further, Cal. Civ. Code Ann. § 3439 states that, "[i]n determining the actual intent

23  under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any

24  and all of the following: to all relevant factors including, but not limited to, the following: […]

25  whether before the transfer was made or obligation was incurred, the debtor had been sued or

26  threatened with suit, whether the transfer was of substantially all of the debtor's assets; […]

27  whether the value of the consideration received by the debtor was reasonably equivalent to the

28  value of the asset transferred or the amount of the obligation incurred."

206.    Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

207.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

208.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

209.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

210.    Upon information and belief, the UTVA Defendants acted (a) with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

211.    The UVTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties, such as the Plaintiffs, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions as described in this Complaint.

212.    As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale

1  of Fluorosurfactant Products.

2      213.      Pursuant to Cal. Civ. Code Ann. § 3439.07, Plaintiffs seek to avoid the transfer of

3  E.I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and

4  to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by

5  this Court or a jury under this Complaint.

6      214.      Plaintiffs further seek all other rights and remedies that may be available to them

7  under UVTA, including prejudgment remedies as available under applicable law, as may be

8  necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged

9  in this Complaint.

10                          **SEVENTH CAUSE OF ACTION**

11                                  **CIVIL CONSPIRACY**

12      215.  Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

13      216.  At all times relevant herein, Defendants actually knew of the hazards that PFOS

14  and/or PFOA posed to the health of those exposed to these compounds.

15      217.  Beginning in the 1960s and continuing through the date of the filing of this

16  Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to

17  the Plaintiffs. Each Defendant performed at least one overt act in furtherance of this conspiracy.

18  Specifically, Defendants colluded for the avowed purpose of providing information about

19  Fluorosurfactant Products to the public and the government, with the true, unlawful purposes of:

20 a.  intentionally misrepresenting to the EPA and the public that their Fluorosurfactant Products were

21  safe and did not pose a risk to human health and the environment;

22 b.  concealing the dangers of their Fluorosurfactant Products, including the products' characteristics

23  and their propensity to contaminate soil and groundwater, from the government and public by,

24  among other means, repeatedly misrepresenting how Fluorosurfactant Products were being

25  disposed of;

26 c.  concealing the dangers of PFOA and/or PFOS from consumers and the public; and

27 d.  using their considerable resources to fight legislation concerning PFOA and/or PFOS.

28      218.  As a direct and proximate result of Defendants' conspiracy, Defendants'

1   Fluorosurfactant Products at all times relevant to this litigation have:

2 a. Caused physical and emotional injuries to Plaintiffs;

3 b. Caused Plaintiffs to incur, *inter alia*, medical and treatment costs; non-economic damages; loss

4   of earnings and future earnings; and household expenses; and

5 c. required and will continue to require monitoring of Plaintiffs' physical condition.

6                          **EIGHTH CAUSE OF ACTION**

7                          **WRONGFUL DEATH**

8        219.    Plaintiffs hereby incorporate by reference the allegations contained within the

9   preceding paragraphs of this Complaint as if restated in full herein.

10       220.    Plaintiffs bring this claim, where applicable, on behalf of Plaintiff Decedents'

11  Estates and for the benefit of the Plaintiff Decedents' lawful beneficiaries.

12       221.    As a direct and proximate result of the conduct and/or omissions of the

13  Defendants as outlined above, Plaintiff Decedents suffered bodily injury resulting in pain and

14  suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life,

15  shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of

16  earnings, loss of ability to earn, funeral expenses, and death.

17       222.    As a direct and proximate cause of the conduct of Defendants, Plaintiff

18  Decedents' beneficiaries have incurred hospital, nursing and medical expenses, and estate

19  administration expenses as a result of Decedents' deaths. Plaintiffs bring this claim on behalf of

20  Decedents' lawful beneficiaries for these damages and for all pecuniary losses and under all

21  other applicable state statutory and/or common laws.

22                         **NINTH CAUSE OF ACTION**

23                         **SURVIVAL CLAIMS**

24       223.    Plaintiffs hereby incorporate by reference the allegations contained within the

25  preceding paragraphs of this Complaint as if restated in full herein.

26       224.    As a direct and proximate result of the conduct of Defendants, Plaintiff Decedents,

27  prior to their death, were obligated to spend various sums of money to treat their injuries, which

28  debts have been assumed by their Estates. As a direct and proximate cause of the aforesaid,

1   Plaintiff Decedents were caused pain and suffering, mental anguish, and impairment of the

2   enjoyment of life until the date of their deaths. Further, as a direct and proximate result of the

3   aforesaid, Plaintiff Decedents suffered a loss of earnings and earning capacity. Plaintiffs bring

4   this claim on behalf of Decedents' Estates pursuant to C.C.P § 377.60 and common law.

5       225.    As a direct and proximate result of the aforesaid, and including the observance of

6   the suffering and physical deterioration of Plaintiff Decedents until the date of their deaths,

7   Plaintiffs have and will continue to suffer permanent and ongoing damage. Plaintiffs' spouses or

8   heirs, as Administrators or beneficiaries of the Estates of Plaintiff Decedents, bring all claims set

9   forth in this Complaint on behalf of Decedents' Estates for damages under applicable statutory

10  and/or common laws, and in their own right.

11                 **TOLLING OF THE STATUTE OF LIMITATIONS**

12      226.    Plaintiffs hereby incorporate by reference the allegations contained within the

13  preceding paragraphs of this Complaint as if restated in full herein.

14                        **Discovery Rule Tolling**

15      227.    Plaintiffs did not know, nor could they have reasonably discovered by the exercise

16  of reasonable diligence, that exposure to fluorochemical products, including AFFF, PFOA, and

17  PFOS was harmful to human health. The risks of said chemicals and AFFF were not obvious to

18  the users of AFFF, nor were they obvious to individuals such as Plaintiffs in the vicinity of AFFF

19  use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with

20  the use of fluorochemical products, they could not protect themselves from exposure to

21  Defendants' fluorochemical products. For this reason, all applicable statutes of limitations have

22  been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

23      228.    Plaintiffs had no way of knowing about the risk of serious injury associated with

24  the use of, and exposure to, AFFF and fluorochemical products until very recently. Further,

25  Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure

26  to AFFF, PFOA, PFOS, and other fluorochemical products is harmful to human health within

27  the time period allowed by any applicable statute of limitations.

28      229.    Plaintiffs had no way of knowing about the risk of serious injury associated with

the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF is harmful to human health within the time period allowed by any applicable statute of limitations.

230.    During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products. Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

231.    Wherefore, all applicable statutes of limitations pertaining to Plaintiffs' claims have been tolled by operation of the discovery rule.

### Fraudulent Concealment

232.    Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

233.    This fraudulent concealment continues to the present day.

234.    Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

### Estoppel

235.    Defendants were under a continuous duty to consumers, end users, and other persons, such as Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

236.    Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF and the health risks associated with the same.

237.    Wherefore, Defendants are estopped from relying on any statute of limitations in

1   defense of this action.

2   **PUNITIVE DAMAGES**

3       238.     Under the applicable laws of the State of California, Plaintiffs seek punitive

4   damages due to the wanton and willful acts and/or omissions of Defendants as set forth and

5   alleged throughout this Complaint.

6   **PRAYER FOR RELIEF**

7       239.     Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

8           a.     Compensatory damages and all other special damages according to proof

9                including, but not limited to past and future medical and treatment costs;

10                non-economic damages; loss of earnings and future earnings; and

11                household expenses, among others;

12           b.     Avoiding the transfer of DuPont's liabilities for the claims brought in this

13                Complaint;

14           c.     Exemplary and Punitive damages;

15           d.     Consequential damages;

16           e.     Pre-judgment and post-judgment interest;

17           f.     Attorney's fees; and

18           g.     Any other and further relief as the Court deems just, proper, and equitable.

19

20   **JURY TRIAL DEMANDED**

21       Each Plaintiff hereby demands a trial by a jury on all of the triable issues of this

22   complaint. Plaintiffs do not seek to have their claims tried jointly.

23   Dated: August 14, 2025

24

25                 */s/ David Fernandes*_____
              David Fernandes (SBN 280944)

26                 **BARON & BUDD, P.C.**
              Holly Werkema (TX Bar No. 24081202)

27                 *(Pro Hac Vice Forthcoming)*
              hwerkema@baronbudd.com

28                 3102 Oak Lawn Avenue, Suite 1100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dallas, TX 75219
Tel.: (214) 521-3605
Fax: (214) 279-9915
Email: dfernandes@baronbudd.com

**COSSICH, SUMICH, PARSIOLA**
**& TAYLOR, LLC**
Philip F. Cossich, Jr. (LA Bar No. 1788)
*(Pro Hac Vice Forthcoming)*
pcossich@cossichlaw.com
Christina M. Cossich (LA Bar No. 32407)
*(Pro Hac Vice Forthcoming)*
ccossich@cossichlaw.com
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000

*Attorneys for Plaintiffs*